Pilato v State of New York (2024 NY Slip Op 51229(U))

[*1]

Pilato v State of New York

2024 NY Slip Op 51229(U)

Decided on August 5, 2024

Court Of Claims 

Mejias-Glover, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 5, 2024
Court of Claims

Anthony Pilato, Claimant,

against
State of New York, Defendant.

Claim No. 134138

For Claimant:
THE GORDON LAW OFFICE, P.C.
By: Mark Gordon, Esq.
For Defendant:
LETITIA JAMES, ATTORNEY GENERAL
By: J. Gardner Ryan, Esq.,
Assistant Attorney General

Linda K. Mejias-Glover, J.

A trial on the sole issue of liability was conducted before this Court on May 22, 23 and 26, 2023 via Microsoft Teams upon the consent of all parties and counsel. Claimant and Defendant each called three witnesses to testify.
The parties stipulated to the following facts: This collision occurred on October 24, 2019, at approximately 6:20 a.m., in the northbound lane of State Route 208 in the vicinity of mile marker 208 8301 1018, 0.1 miles south of a traffic signal at an intersection with Mountain Rd. in the Town of Blooming Grove, County of Orange, State of New York. State Route 208 in the relevant area is a two-lane, designated North/South highway surfaced with asphalt with a painted double-yellow center line and white highway edge lines. It was pre-dawn, the highway pavement was dry and clear. The weather and roadway condition were non-contributory to the occurrence of the collision. Claimant, Anthony Pilato, was operating a 2003 Toyota Echo, two-door sedan, northbound on Route 208 on his commute from his home in Central Valley, New York to his work as a school bus driver for the Washingtonville School District. The State driver, Christopher Morrison, in the course of his employment with the New York State Office of Mental Health, was operating a State-owned 2005 Freightliner Tractor with an attached enclosed box trailer. At the time of collision, the tractor-trailer operated by Morrison was in the process of a left turn onto the southbound lane of Route 208 from a paved parking lot in front of a [*2]commercial premises known as Somni Tapas Bar and Grill [FN1]
located to the east of the highway at 509 Route 208. Both Claimant and Morrison each possessed a valid New York State Commercial Driving License ("CDL") issued by the New York State Department of Motor Vehicles.
 Relevant Testimony
Claimant, Anthony Pilato
Mr. Pilato testified that on October 24, 2019, he was employed as a school bus driver for the school district of Washingtonville, as well as an employee at Pep Boys Distribution Center (T1 [FN2]
. 32, lines 14-16). He testified that he was operating a 2004 Toyota Echo, two-door sedan when the accident occurred at approximately 6:00 a.m., while he was traveling to pick up his school bus to begin work as a school bus driver (T1. 33). He described his usual route that he would take in the morning from his house to his job at Washingtonville School District as follows: "I would go down Route 32 South to Route 17 East, get on 17 East and take that to Exit 130 which is Route 208 going north and then proceed up 208 to a traffic light make a left on Hudson, continue through that little road to Route 94, and then make a right turn" (T1. 34).
Mr. Pilato testified that the contour of the roadway in which the accident occurs "pitches up a little bit on a slight incline, then it dangles to the right and downward a little bit towards the restaurant" (Id.). He went on to testify that the conditions were dark, it was 6:20 a.m. and there were no streetlights on the road, there was a little illumination from his headlights (T1. 35). Mr. Pilato testified that he was traveling north on Route 208, where the speed limit was 45 miles per hour (Id.). He testified that he "approached the curve/hill, [he] decelerate[d] just slightly by taking [his] foot off the gas and letting it glide over the top of the hill just to keep control and be prepared for anything" (T1. 35-36). He testified that as he proceeded over the hill, he observed something in front of him that he could not identify (T1., p. 49, lines 6-7), he "proceeded forward at the speed that [he] was going trying to identify what's in front of [him]" (Id. at lines 20-21), and as he got closer to the object, it looked like a "blackboard" in front of him because it was black outside (T1. 49, lines 24-25). He testified as the object got closer it appeared at eye level as a piece of steel (T1. 51), and the object was close to the slope at foot of the hill that he came down off of and so he could not perceive it what it was until he was within feet of it (T1., p.51, lines 21-24). He went on to testify that when he saw what he described as a blackboard of the tractor-trailer as he went over the hill, and saw headlights of a tractor-trailer (T1., p.51, line 25 — p 52, lines 1-3). He then testified that as he went over the hill, he saw headlights on his left, but could not see anything beyond them because it was dark out (T1., p.52, lines 5-7). He testified that when he became aware that the tractor-trailer was blocking his lane of travel, he pulled to the right, but was not sure if he tried to steer away, but he was intent on stopping his vehicle before impact (T1., p. 52, lines 15 — 23). He testified that his headlights illuminated the object in front of him, but only when he was within feet of it (T1., p.52, lines 24-25 to p. 52, lines 1-2). 
Claimant described the impact as follows: his vehicle's hood began to go underneath the truck and his windshield and roof collided with the steel bar on the side of the struck and [*3]collapsed inward towards his head (T1. 53).
After the accident, Claimant testified that he was unable to access his vehicle himself (T1. 72). He was contacted by Cool Risk Management Services, a Claims Administrator for the State of New York by telephone and letter and check offering a settlement in the amount of $1,995.00 (T1. 72-74) (Ex 14).
On cross-examination, Claimant testified that after he had retained counsel, he received a check from Cool Risk Management for the damage to his car (T1.118). He testified that during the school year, he would drive for the Washingtonville School District five days a week, reporting at approximately 6:40am and usually taking the same route every day (T1. 122-124). He testified that he has driven on Route 208 for approximately 18 years (T1. 125). Mr. Pilato went onto testify that the whole section from the hill and curve up to Mountain Avenue was dangerous, and on the day of the incident he recalled lifting his foot off the gas pedal (T1.126-127). He testified that as he entered the curve and crested the hill, he could see lights of oncoming traffic on his left side, which became immediately visible as he crested the hill (T1. 131).
Claimant testified that he observed two white headlights coming from one vehicle and no other lights visible beyond that (T1. 136, 140). After reviewing Defendant's Exhibit OO, a photograph of Defendant's vehicle, he testified that he observed that there were lights of top of the trailer van being pulled by the tractor (T1. 143). He went on to testify that as he crested the hill, as a result of the illumination from his headlights for a period of seconds he could no longer see the double yellow line ahead of him on the highway (T1. 146). Mr. Pilato testified that his headlights were the first thing that alerted him to an obstruction ahead and within seconds thereafter, he "saw black" in front of him (T1.148-149). He also testified that he then became aware that there was an obstruction, "within a few feet" from him and in a matter of seconds he locked up his brakes, released the clutch, steered to the right and his tires locked up and skidded along the pavement (T1. 150).
Claimant testified that he had his low beams on that his headlights did not illuminate any portion of the tractor-trailer as he passed it (T1. 154-155). He testified that the first part of the tractor-trailer that he was able to observe, due to the light provided from his headlights, was the trailer, which extended from left to right perpendicular to the road in front of him (T1. 157). Mr. Pilato testified that immediately after the impact, he appreciated "for a fleeting moment" that he struck the bottom rail of a tractor-trailer (T1. 160). He testified that on the morning of the incident, he was driving his vehicle at a speed in which he could stop within the distance of the light projected by the headlights of the vehicle (T1. 161).
Christopher Morrison
Mr. Morrison testified that on the date of the incident, he was driving a tractor-trailer for the New York State Office of Mental Health (hereinafter "NYS OMH") (T1. 166). He testified that he has been employed by the NYS OMH since approximately 1997 (T1. 167). On the date of the accident, he testified that he was not wearing glasses, had a Commercial Driver's License and had operated the specific tractor-trailer involved in the instant claim in the past (Id.).
On the date of the incident, Mr. Morrison testified that while operating the tractor-trailer, he was attempting to exit from what had been designated as "the entrance" of a parking lot (T1. 168-169). He testified that prior to the accident, he had operated his personal vehicle on Route 208, however, has never driven past exit 17, which is where the New York State Department of Transportation ("NYS DOT") is located (T1. 170). When asked if he was aware of the driving [*4]guidelines set forth in the New York State Commercial Driver's Manuel ("CDM"), he testified that he was unaware of the current guidelines and had not read the manual since approximately 1993 (T1. 173).
Mr. Morrison testified that he conducted a pre-trip vehicle inspection prior to starting his workday at 4:00 a.m., on the day of the incident (T1. 174). He started his day in Orangeburg and had four stops that day, the first at the Midstate Psychiatric Center (Id.). He testified that after he completed his four scheduled stops, his plan was return to Rockland to refuel at the NYS DOT depot, located off the exit of Routes 17 and 208, but it was closed (T1. 175). Mr. Morrison testified that he was familiar with the parking lot of the restaurant that he entered, and that he intended to figure out a safe way to turn around (T1. 178). He testified that he was in the parking lot for approximately five to ten minutes before he attempted to exit through the same way he entered (T1. 178, 183), because he knew he could not exit the lot through the designated exit lane (Id.). Mr. Morrison testified that he entered the parking lot, there were concrete buckets with cement in them and a rope or a chain link in between each pole, which created the entrance and exit from the parking lot (T1. 182). He testified that the headlights on the tractor-trailer were on the entire time it was in operation (T1. 184).
Mr. Morrison testified that he attempted to make a left-hand turn from the parking lot onto Route 208, with the trailer facing west (T1. 183-184), starting off in fourth gear and going up to 15-20 miles per hour when moving into the left lane of Route 208 (T1. 186). He testified that based upon his training and experience operating a commercial tractor-trailer it would take approximately 20 seconds to turn the vehicle into the left-hand lane (Id.). He estimated that he got approximately 85-90 percent of the trailer portion of the truck into the southbound lane (T1. 187) before the accident occurred. He testified that as of the time of the accident, he had no basis to form an opinion as to whether Mr. Pilato was operating his vehicle at an excessive speed (T1. 197). Mr. Morrison testified that he did not observe the impact of Claimant's vehicle with the tractor-trailer, nor did he feel the impact but heard it and stopped his vehicle (T1. 199-200). He testified that he stopped in the lane of travel and was unaware that he was dragging Mr. Pilato's vehicle until it became horizontal with the lane of traffic (T1. 200).
On cross-examination, Mr. Morrison reiterated that on the day of the accident, prior to starting his workday, he conducted a "walk-around" of his truck (T1. 205). He further testified that he usually conducted a "pre-trip" inspection the day before, which consisted of checking tires, oils, lights — specifically headlights, parking lights, flashers, and hazards and walking around to make sure they all blink, checking lug nuts, making sure all doors are up and nothing is loose (Id.). He further testified that there are lights both on the tractor and trailer (T1. 205-206) and all the lights on the truck were working on the morning of the accident and that when he left the DOT facility in Rockland County (T1. 206). When shown Defendant's Exhibit MM, Mr. Morrison testified that there are: two lights on the front of the cargo trailer called clearance lights; two lights above the refrigeration unit and on the corners of the trailer; one on each side in the front facing left and right (T1. 206-207). He testified that the LED light reflects amber or orange color (T1. 207).
He testified that on the tractor-trailer he drove on the morning of the incident, are two headlights, two lights that are orange on each fender, which stay on just as a parking light would or flash when the turning signal is on. There are two lights, one under each mirror, which stay lit as a parking light and blink when turning. There are five regular cab lights, on the top of the truck by the air horns. Underneath the door of the truck, above the fuel tank, on both sides there [*5]is a strip of five orange lights under the door. Behind the cab, there are six red lights that are flush mounted, four of which blink when turned on. Behind the truck under the trailer, there are two red tail lights and two white reverse lights (T1. 207-208). He testified that all of the lights he described were on during the operation of the vehicle (T1. 210).
Mr. Morrison testified that when he arrived at the NYS DOT facility, he observed that the gate was closed, so he decided to continue on that same road to look for a safe place to turn around (T1. 214, lines 9-25). While continuing on Route 208, he found no other places to turn around (T1. 215, lines 14-15). He testified that he was traveling on Route 208 at approximately 40 miles per hour and there was little traffic in the northbound lane and no cars either in front of or behind him in the southbound lane (T1. 216, lines 5-16).
Mr. Morrison testified his goal when he pulled into restaurant parking lot was to make a U-turn. He pulled into the front section of the restaurant parking lot, getting the whole truck and trailer off of the roadway and pulled up to the exit sign. He testified that he knew he could not make a U-turn in this location (T1. 220, lines 17-25, 221, line 1). As he prepared to exit the parking lot, he pulled forward toward Route 208 and stopped before the white line (T1. 221, lines 18-24), put on his turning signal, looked left and, looked left again and then proceeded out of the parking lot after observing that the roadway was clear (T1. 222, 224). He testified that when the turning signal was on, the lights on the front fenders, on the mirrors, behind the cab of the truck, underneath the trailer, by the fuel tank and in the back of the trailer also flash (T1. 223).
He further testified that the wheels of his truck were still straight when he started to make his left turn (T1. 225), but he started to turn his vehicle after its front wheels reached the southbound lane (T1. 226). He noted that his turning lights were on the whole time (Id.). Mr. Morrison testified that at the time the cab was already at the yellow lines, he observed headlight illumination coming at or towards the curve of Route 208 heading northbound (Id.), approximately 150 feet away (T1. 228). It was his testimony that when he perceived the light coming towards him, he attempted to shift gear more quickly to attempt to get his vehicle out of the way (T1. 227). He further testified that when he observed Claimant's vehicle, he attempted to go onto the grass a little bit off the road to pull more of the trailer over, trying to shift as quickly as possible (T1. 229). Mr. Morrison finally saw Claimant's vehicle when it came around the corner and he was trying to get out of the way (Id.). He testified that at "one point, he realized [Claimant] had seen him" and his "car just locked into a skid" (Id.). He testified that he was unaware how long the skid was, but he believed Claimant's vehicle missed the trailer until he heard the noise, looked into his mirror and observed Claimant's vehicle (Id.). Mr. Morrison testified that based on his years of driving, he believed Claimant was driving fast for that curve (T1. 230).
Gregory L. Witte
Mr. Witte testified that he is an accident reconstructionist, and testified as to his professional experience, his education, the degrees and certifications he has earned, as well as to the accreditations he has received (T2 [FN3]
. 5-8). Upon application of counsel and based upon the foregoing, Mr. Witte was deemed an expert witness, without objection (T2. 11). Mr. Witte [*6]testified that he prepared a report in this matter in the normal course of business, after review of the photographs from the accident scene, state police photographs, a Motor Vehicle Accident [MVA] report and depositions (T2. 12-13).
Mr. Witte testified with respect to the roadway where the accident occurred, stating that the contour while traveling north on Route 208 is a gradual right curve with a downward slope as one heads north approaching the intersection where the accident occurred (T2. 17). He described the signage in the parking lot as containing a white directional arrow at one end of the parking lot with a white sign and black lettering stating, "entrance only", another white directional arrow at the far end of the parking lot with a white sign and black lettering stating, "exit only" and a chain that ran across the parking lot creating the entrance and exit (T2. 17-20). He went on to testify that the type of vehicles involved in the accident are significant to his investigation as they are "massively different in size" and both are able to produce data from the crash (T2. 20).
Mr. Witte was shown a letter from Cool Risk Management (Claimant's Exhibit 14), and agreed with the findings contained in that letter, to wit: 80% responsibility with the driver of the New York State tractor-trailer (T2. 24).
After a review of Defendant's Exhibit XX, Mr. Witte opined with a reasonable degree of accident reconstruction certainty that the impact was in the north lane and northbound shoulder of Route 208 (T2. 34). He further opined with a reasonable degree of accident reconstruction certainty, applying a friction test utilizing a range of friction values (due to the presence of several unknowns and the consideration given to the effect of the fog lines as it relates to friction), that the speed of Claimant's vehicle at the time of impact was between 38 to 44 miles per hour. (T2. 37-39, 46). Mr. Witte also testified that the assessment of Claimant's vehicle's speed at 46 miles per hour contained Mr. Pucino's expert report (Defendant's expert witness), is incorrect as there is no scientific finding to add 5 miles per hour to his speed (T2. 42-43).
Mr. Witte estimated the length of Defendant's vehicle from the tip of the operator to the end of the trailer to be approximately 66 feet (T2. 47). He opined with a reasonable degree of certainty that it would take approximately 11 to 15 seconds to move the trailer from the location on Route 208 across into the northbound lane (Id.). Mr. Witte testified that perception-response time ("PRT") is "the time when a person sees, identifies, and makes a decision whether or not the object that he's seeing is a hazard to him, and to what his base of action is going to be, to the point where he gets his foot on the brake and begins active braking" (T2. 58). He opined after reviewing Defendant's Exhibit T, with a reasonable degree of accident reconstruction certainty that the time of day at which the accident occurred is significant as the lighting affects the PRT (T2. 59-60).
Mr. Witte opined after reviewing Defendant's Exhibit OO, with a reasonable degree of accident reconstruction certainty, that the tractor-trailer's headlights would have been blinding to Claimant as he came straight towards the tractor-trailer based upon the small size of Claimant's vehicle which puts the headlights of the tractor-trailer at approximately even level with Claimant's eye level (T2. 65-66). Mr. Witte further opined that the skid marks help identify point of impact, where maximum engagement occurred and where the redirection occurred (T2. 77-78).
Mr. Witte testified that as part of his normal course of business, he was asked to review the black box from Mr. Pilato's vehicle, but that he was unable to ascertain the black box or its data (T2. 72, lines 9-16). He described his efforts to obtain the black box, stating that he was not able to develop a lead on it (Id. at lines 19-21). It was his testimony that he was made aware that [*7]the Pilato vehicle was unavailable when he received a copy of a correspondence to the Pilato family from the State, which indicated that the State had the vehicle (T2. 74, lines 20-25). 
Mr. Witte testified that based upon his training, experience, and a review of the documents, depositions, and facts of this case, he opined with a reasonable degree of accident reconstruction certainty (T2. 84, lines 23-25, p. 85, lines 1-4) that "Mr. Morrison failed to yield to Mr. Pilato, failed to use reasonable judgment when exiting the parking lot with such a large vehicle and such limited sight distance, especially when he had better alternatives to consider" (T2. 85, lines 10-15). He went on to testify that the "better alternatives" would have been to maneuver his vehicle and back his trailer to the north side of the restaurant parking lot to create an increased sight line by almost double (T2. 85, lines 19-25) or he could have traveled further north to the firehouse and turned around in there (T2. 86, lines 1-8).
On cross-examination, Mr. Witte testified that he conducted an inspection of Defendant's vehicle at the NYSDOT in Rockland County and took the measurement of the height of the headlights on the tractor by a "3D laser scan" and concluded that the headlights are eyeline with Mr. Pilato's sight, but he was unable to recall the height of the headlights, nor did he measure the height of Mr. Pilato's vehicle (T2. 108-109). He testified that every driver on straight and curvy roads, driving on a dark two-lane road, one lane in each direction, approaching a vehicle going in the opposing lane direction, both with their headlights on would experience the "phenomenon of blinding" and would not "necessarily slow down" just because they are in that scenario (T2. 117). He testified that the speed range he calculated suggests that Mr. Pilato slowed down as a result of experiencing the headlights from Defendant's approaching vehicle (T2. 118) when he was coming down the "crest" of the hill by taking his foot off the accelerator (T2. 119-120).
Mr. Witte testified that he was unable to view the truck in the condition that it would have appeared to the Claimant because it was hard for him to access to the truck (T2. 127).
While viewing Exhibit MM, which depicts the perspective on Route 208, south of the location of the accident where Mr. Pilato would have passed as he approached the point of impact, showing the headlights of the tractor, as well as the marker lights on top of the tractor and refrigeration unit, Mr. Witte testified that those lights and markers would have "probably [been] visible" to Mr. Pilato (T2. 133-135). He further testified that before Mr. Pilato reached the point where the truck ultimately came to a controlled stop after the accident, he applied his brakes hard enough to lock up the front wheels, (T2. 169) traveling 54 feet per second at his PRT time of 2.1, which is about 113 feet.
Mr. Witte testified that when he visited the accident scene, he measured the line of sight at the fog line for Mr. Morrison at 10 feet, by using the location based on his truck's dimensions, up to the center of the roadway using a Point Cloud laser scan (T2. 151). He further measured Mr. Morrison's maximum sight distance to the left moving out onto the highway as 162 feet (T2. 152) and from his position of start to the southbound lane of Route 208 as approximately 450 feet (T2. 153-154). He testified that there was no evidence that Mr. Morrison knew that Mr. Pilato was approaching before he could see Mr. Pilato's headlights as they came around the curve, but notwithstanding, he concluded that Mr. Morrison failed to yield (T2. 155-156).
On re-direct examination, Mr. Witte testified that Mr. Morrison violated the failure to yield right of way by trying to make the left-hand turn to clear his tractor and his trailer, and Mr. Pilato steered right and hit the brakes (T2. 180). He testified that Mr. Morrison not only violated the failure to yield the right of way and agreed that he had violated Vehicle and Traffic Law [VTL] 1212 (T2. 180-181). He further testified that "Mr. Morrison, in this situation, failed to use [*8]common sense, [to] see what was there to be seen" (T2. 181). Mr. Witte testified that based on his experience, years of service, and being declared an expert in the field of accident reconstruction, Mr. Morrison is responsible for this accident (T2. 184).
Claimant rested and Defendant put on its case-in-chief.
Investigator Bryan Whelan
Investigator Whelan testified that he is an investigator with the New York State Police currently assigned to the Computer Crimes Unit (T2. 187) and completed the academy in June of 2013 (T2. 188). He worked in Plattsburgh for three years and then in January 2017, he worked as a highway trooper in Monroe, responding to automobile accidents (T2. 188, 191).
On the date of the accident, Investigator Whelan reported to the scene (T2. 196) and observed "a tractor-trailer stopped on the side of the southbound lane, more towards the shoulder, and then [he] saw a vehicle on the northbound lane towards the shoulder, that was obviously damaged and not facing the correct direction of which lane it would have been in" (T2. 194). He attended to both drivers and observed that Claimant was injured. Investigator Whelan took photographs of the scene (T2. 195), and secured the scene, "making sure any vehicular traffic that was coming either north or south wasn't going to further create an accident" (T2. 196). Investigator Whelan was shown Defendant's Exhibit ZZ1 and testified that the skid marks left from Mr. Pilato's vehicle were over 100 feet long (T2. 205).
Investigator Whelan testified that Mr. Morrison stated that he was turning on to the southbound lane from the restaurant, and that "there are no NYS DOT regulated state or local municipality regulated signs preventing him from, or prohibiting him from making the southbound turn, which would be a left-hand turn out of the parking lot" (T2. 206) nor were there any VTLs "that would have been enforceable upon him entering the roadway from the direction and placement that he did" (T2. 208).
On cross-examination, Investigator Whelan testified that the area in and around the accident location was poorly lit, there are no streetlights, and it was dark outside (T2. 210). Investigator Whelan testified that the impact between Claimant's vehicle and the trailer occurred in the northbound lane near the fog line (T2. 215).
Nicholas Pucino
Mr. Pucino testified that he has been a licensed engineer since 1964 (T3. [FN4]
8), that he retired from the NYS DOT in 1991 (T3. 6), and that he is currently semi-retired, working as an investigator of highway and pedestrian accidents, identifying contributing factors and causation factors (T3. 5). After testifying about his qualifications and experience, he was deemed an expert witness on consent (T3. 9-10). He testified that in his work as a professional engineer he evaluated sight distance as part of his normal design process and noted that it is an important part of intersection design and safety (T3. 11).
Mr. Pucino testified that in order to evaluate the conditions impacting this accident, he inspected the site on February 3, 2020, March 16, 2022, and June 8, 2022 (T3. 18). He made observations and measurements, secured the record plans for the construction, the construction history to get a sense of what was built there, what kinds of pavement, and what feature if any [*9]contributed to the accident (T3. 12). He described the signs approaching the accident location as follows: two 45 mile per hour speed limit signs, a curve sign, and a driveway intersection symbol sign approaching the curve, as well as the grade heading in the northbound direction, and an arrow on the pavement and an entrance sign in the restaurant parking lot (T3. 18).
After reviewing Defendant's Exhibit KK, Mr. Pucino testified that the intersection sight distance in this case illustrates "Mr. Morrison looking south at oncoming traffic to see how much time and site distance he has in order to make his turn. Stopping sight distance is the sight distance that Mr. Pilato would have looking at an object in the roadway, such as a tractor-trailer" (T3. 22). After reviewing Defendant's Exhibit T, Mr. Pucino testified that he set the camera 10 feet off the edge of the roadway when taking this photograph to depict where Mr. Morrison's eye would be and how far he could see onto oncoming traffic and "using that information both graphically and mathematically, [he determined] the sight distance to that particular car on that line, which would be a conservative estimate of the available intersection sight distance that Mr. Morrison would have waiting at the intersection" (T3. 24). He went on to testify that a sightline does not need to be unobstructed and here, there is a slight obstruction from the signpost, and up higher there are bushes and trees, but that such obstruction does not hinder the ability to identify if there is an oncoming vehicle (T3. 26) nor does it inhibit a motorist from determining whether it is safe to pull out of the driveway (T3. 28). He measured the signpost for the intersection warning to be 181 feet from the position of Mr. Morrison (T3. 28-29) and measuring from the center of the lane that Mr. Morrison would be crossing to Mr. Pilato would equate to a stopping sight distance of approximately 250 feet (T3. 41). He testified that the sight distance will change with darkness and lighting conditions (T3. 32), however sightline is not affected by darkness (T3. 33).
Mr. Pucino testified that he evaluated the signs relative to Mr. Morrison's making a left turn from the restaurant driveway which depicted "entrance only" with an arrow type sign, installed by the property owner and not installed officially by the State in accordance with the Manual of Uniform Traffic Control Devices (T3. 42). He testified that based upon his investigation and his application of the American Association of State Highway and Transportation Officials (AASHTO) Highway Safety Manual to his calculations, Mr. Morrison would not have been able to make a U-turn through the more northerly driveway to proceed south on route once he was on the property as he would have to go all the way off the roadway on the other side (T3. 45-47). He testified that "stanchions" and some sort of chain were located on the restaurant property to the east of Route 208 separating the restaurant parking area from lanes of travel on Route 208 (T3. 49). He testified that Mr. Morrison could have made a left or a U-turn without contacting the stanchions and poles but would have to "go off the highway to the opposite side of the roadway quite some distance before he'd get back in the roadway" (T3. 50).
He testified that the sight distance for Mr. Pilato as Mr. Morrison was crossing over the northbound lane of Route 208, is 325 feet and the stopping distance was only 307 feet (T3. 53). Mr. Pucino was showed Defendant's Exhibit N, the report of the skid test run by NYS DOT and testified that the actual skid test revealed that the friction number is 56 out of 100, which accounts for the grade and confirmed his anticipation that the friction values were higher than indicated by Mr. Witte (T3. 57-60). He testified that for a tractor-trailer such as the one driven by Mr. Morrison, the clearance time (the time necessary to come out and clear an intersection) is 11.5 seconds (T3. 63) which is significantly more than that of a passenger vehicle (T3. 62). Mr. Pucino testified that based upon this, Mr. Morrison needed approximately 760 feet in sight [*10]distance to safely clear the intersection, which he did not have (T3. 63).
On cross-examination, Mr. Pucino testified that Mr. Morrison did not have enough time or distance to maneuver to make a left turn and clear the opposing traffic. He testified that on the 3 occasions that he visited the accident site, he followed the private signs entering through where the "entrance sign" was posted and exiting through the "exit sign" (T3. 74), as opposed to Mr. Morrison who on the date of the accident exited through the driveway designated by an, "entrance sign" (T3. 73). He agreed that when drivers are making a maneuver to make a left turn or a U-turn, they need to yield to drivers that have the right of way if they can see them (T3. 81).
Mr. Pucino testified that the visibility is not greater during broad daylight, as Mr. Morrison's vehicle's headlights could allow visibility to be even greater to observe an object than in the daytime (T3. 83). He further testified that the "curve" Mr. Pilato traveled leading to the accident location, does not restrict the sight distance, but rather an obstacle in the inside of the curve that restricts the sight distance (T3. 84-85). He went on to testify that Mr. Morrison did not have 800 feet to make the left turn but did so unsafely as it is "incumbent on the oncoming driver when we're talking about slow large vehicles to observe that vehicle in their path and adjust their speed so that they don't crash into them" (T3. 86). Mr. Pucino testified that when Mr. Pilato observed some part of the trailer and tractor, "which is obviously not a passenger car with a whole bunch of lights" that it is an "immediate flag to be careful" (T3. 89).
Richard Hermance
Mr. Hermance testified that he has been an accident reconstructionist for over 40 years (T3. 97). After testifying about all of his qualifications, experiences, and memberships to professional associations, he was deemed an expert witness on consent (T3. 97-98). He testified that he reviewed the police report, transcripts, photographs from the accident scene, and Mr. Witte's report (T3. 100).
He testified that he visited the accident site and agreed with Mr. Witte's report that the friction range was 0.55 to 0.7 (Id.). Mr. Hermance testified that he used a Vericom VC3000 computer, mounted it to the car and ran the speed and then slammed on the brakes to access the friction and after three runs, he determined the average friction was 0.67 (T3. 101). He testified that friction of the roadway defines how much resistance the pavement gives to a vehicle and is the adhesion force between the rubber and the pavement (T3. 101-102). He went on to testify that the skid number that he determined from his own testing is adjusted based upon the grade of the right, the sight, and the actual conditions of the road (T3. 103).
Mr. Hermance testified that "contrary to popular belief, the weight of a vehicle does not matter in the distance it takes to stop" (T3. 104). He testified that based upon his observation of the skid marks, Mr. Pilato's vehicle skidded straight, which means it had equal braking (T3. 107), and that on the basis of his skid tests, Mr. Pilato's minimum speed at the time his car commenced its skid was about 44 miles per hour (T3. 112). Mr. Hermance prior to trial, observed the state police photograph of the skid at the scene of the accident along with a 100-foot tape measure (T3. 114), and testified that the longer the skid mark, the higher the speed the vehicle was traveling (T3. 115).
Mr. Hermance testified that the total sight distance available to Mr. Pilato was about 307 feet and the total sight line to the intersection was about 325 feet (T3. 117). He opined with a reasonable degree of accident reconstruction certainty that had Mr. Pilato slowed down his vehicle a little bit more, he would have been able to stop his vehicle before impact (T3. 117-[*11]119). Defendant's Exhibit CC, DD, and EE depicted calculations Mr. Hermance made as to Mr. Pilato's total stopping sight distance at the following 3 speeds: 40 miles per hour, 45 miles per hour, and 50 miles per hour (T3. 126) and he testified that Mr. Pilato could have stopped his vehicle prior to impact at any of these speeds (T3. 129). He further testified that he used 2.1 seconds as the PRT, similar to Mr. Witte (T3. 130).
Mr. Hermance testified after conducting the test with his 2017 Yukon at the sight line where Mr. Pilato sat, he was able to see that the truck's parking lights on the trailer portion were visible throughout the turn of the truck (T3. 136-138) and the headlights of the tractor-trailer did not interfere at any point in that distance with the ability to perceive the vehicle turning around (T3. 138). He opined with reasonable degree of certainty as an accident reconstructionist that if Mr. Pilato was traveling at a speed under 50 miles per hour, observing the tractor-trailer at 307 feet away, he could have brought his vehicle to a complete stop before impact (T3. 139). Mr. Hermance opined as an accident reconstructionist, that Mr. Morrison could not have done anything further to assure that he could turn safely (T3. 140).
On cross-examination, Mr. Hermance testified that Mr. Pilato did not observe the long side of the trailer due to the curve (T3. 142). He agreed Mr. Pilato's deposition testimony stated that he took his foot off the gas and proceeded downward and opined that a person should use the brake to slow down (T3. 147). He testified that Mr. Morrison would have needed at least 800 feet to make a left-hand turn into the lane of travel (T3. 149). He went on to testify that he did not himself measure the skid marks in the state police's photograph, however, he did a visual inspection (T3. 150). Mr. Hermance confirmed his prior testimony that based upon his measurements of the skid marks, Mr. Pilato was travelling at a speed of approximately 44.8 miles per hour at the time he applied his brakes (T3. 152), and that if the rear wheels did not lock up, Mr. Pilato would only have had approximately 60-70% braking efficiency (T3. 152).
Mr. Hermance testified that when he conducted his onsite inspection of the scene, he exited the parking lot the same way Mr. Morrison did and parked at approximately the point of impact to do a radar study and then backed up, straightened out the truck and pulled out similarly to Mr. Morrison (T3. 155-157).
Rebuttal Gregory Witte
Mr. Witte testified that the Google Maps photographs marked in evidence as Defendant's Exhibit H & J, have no probative value as they were taken in the daylight and not near the time of the accident (T3. 173-175). Mr. Witte agreed with Mr. Hermance's testimony that Mr. Pilato's vehicle experienced front-wheel lock up, and that there was an amount of rear-wheel lock (T3. 176). He testified that the front-wheel lock up is indicative of a vehicle that is not equipped with ABS brakes and that Mr. Pilato's vehicle did not have ABS brakes (Id.).
Mr. Witte indicated that Mr. Hermance's testimony that intersection clearance for Mr. Morrison's tractor-trailer would require 800 feet for safe clearance is important because it reflects "that there was the much better option to go to the north end of the parking lot and either conduct a K turn or a U turn, whatever he had to do, or just simply exit back out and go north on 208 after the next intersection" (T3 178).
He testified that Mr. Pilato could not have avoided this accident and reiterated that the sight line was 186 feet for any vehicle coming down from the blind curve and opined because time and distance are too close that this accident was unavoidable (T3. 180).

LAW AND ANALYSIS
The issue to be decided in this trial is whether Defendant owed a duty to Claimant, whether Defendant breached that duty, and whether the alleged breach was the proximate cause of Claimant's injuries.
A claimant in a negligence action "must establish, prima facie, that the defendant breached a duty owed to the [claimant] and that the defendant's negligence was a proximate cause of the alleged injuries" (Shah v MTA Bus Co., 201 AD3d 833 [2d Dept 2022]; Hai Ying Xiao v Martinez, 185 AD3d 1014, 1014 [2d Dept 2020] [internal quotation marks omitted]; see Rodriguez v City of New York, 31 NY3d 312 [2018]); Tsyganash v Auto Mall Fleet Mgt., Inc., 163 AD3d 1033, 1033-1034 [2d Dept 2018]).
Drivers of motor vehicles have a duty to operate their automobiles with reasonable care in light of the actual and potential risks that may exist as a result of weather, road, traffic and other conditions. Such duty of care imposes upon drivers obligations to: maintain a safe rate of speed, keep their vehicle under reasonable control; be on a proper lookout under the conditions then prevailing to see and be aware of what is in their view; and use reasonable care to avoid accidents (National Interstate v A.J. Murphy Co., Inc., 9 AD3d 714, 716 [3d Dept 2004]; Woolley v Coppola, 179 AD2d 991, 992 [3d Dept 1992]; Oberman v Alexander's Rent-A-Car, 56 AD2d 814, 815 [1st Dept 1977]; lv denied 42 NY2d 806 [1977]; see PJI 2:77; VTL §§ 1126 [a], 1163[a], [e], 1180[a], 1212).
A driver has a common-law duty to see that which should have been seen through the proper use of his senses (Perez v State of New York, No. 2015-030-018 (Ct Cl, Scuccimarra, J., Nov. 10, 2015]; see Domanova v State of New York, 41 AD3d 633, 634 [2d Dept 2007]; Larsen v Spano, 35 AD3d 820, 822 [2d Dept 2006]; see also Barbieri v Vokoun, 72 AD3d 853, 856 [2d Dept 2010]).
It is well settled that a defendant's unexcused violation of the Vehicle and Traffic Law constitutes negligence per se (Dalal v City of New York, 262 AD2d 596 [2d Dept 1999]; see, Martin v Herzog, 228 NY 164 [1920]; Cordero v City of New York, 112 AD2d 914 [2d Dept 1985]; Tomaselli v Goldstein, 104 AD2d 872 [2d Dept 1984]; Aranzullo v Seidell, 96 AD2d 1048 [2d Dept 1983]; also, PJI 2:26). Here, the record does not support a finding that Mr. Morrison violated any provision of the VTL and there were no citations issued at the scene of the accident.
Pursuant to VTL § 1141, "[t]he driver of a vehicle intending to turn to the left within an intersection . . . shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close as to constitute an immediate hazard" and VTL § 1163(a) further provides that a driver may not make the turn "unless and until such movement can be made with reasonable safety". "The operator of an oncoming vehicle with the right-of-way is entitled to assume that the opposing operator will yield in compliance with the Vehicle and Traffic Law" (Attl v Spetler, 137 AD3d 1176, 1176, [2d Dept 2016]). " 'Although a driver with a right-of-way also has a duty to use reasonable care to avoid a collision, . . . a driver with the right-of-way who has only seconds to react to a vehicle which has failed to yield is not comparatively negligent for failing to avoid the collision' " (Choo v Virginia Transp. Corp., 204 AD3d 743, 744 [2d Dept 2022], quoting Yelder v Walters, 64 AD3d 762, 764, [2d Dept 2009]). Nonetheless, "[d]rivers have a duty to see what should be seen and to exercise reasonable care under the circumstances to avoid an accident" (Filippazzo v Santiago, 277 AD2d 419 [2d Dept 2000] [internal quote omitted]; Balducci v Velasquez, 92 AD3d 626, 628 [2d Dept 2012]). Here, the Court is satisfied that Mr. Morrison attempted his left-turn out of the parking lot only once he [*12]ascertained that there were no vehicles immediately approaching, however, he was negligent in that he attempted this turn in a location too close in proximity to the foot of a hill at a blind curve, and that the turning radius available to him was insufficient to safely complete the turn. Mr. Pilato, as discussed hereinbelow, had a duty to slow down over the hill and around the curve so as to be prepared to avoid Mr. Morrison's vehicle.
There can, however, be more than one proximate cause of an accident (see Gorenkoff v Nagar, 120 AD3d 470 [2d Dept 2014]; Lanigan v Timmes, 111 AD3d 797, 798, [2d Dept 2013]). Pursuant to VTL § 67(1), the driver of a motor vehicle approaching a curve at which he cannot see the road ahead beyond the turn, is to bring his car under such control that he would be prepared to stop if danger suddenly confronted him when he rounded the curve. It is well settled that when a driver of a motor vehicle approaches another automobile from the rear, he or she is bound to maintain a safe rate of speed and has the duty to keep control over his or her vehicle, and to exercise reasonable care to avoid colliding with the other vehicle (Chepel v Meyers, 306 AD2d 235 [2d Dept 2003]; Power v Hupart , 260 AD2d 458 [2d Dept 1999]; see also, VTL § 1129[a]). Here, the Court finds that the record supports a finding that Mr. Pilato failed to slow down in an appropriate and sufficient manner so as to be prepared to stop once through the curve and over the hill.

DECISION
Applying the foregoing, the Court finds that Claimant has proven his claim against the State, by a preponderance of the credible evidence. Although the Court finds that Mr. Morrison's actions were a substantial factor in causing the accident, the Court finds that Mr. Pilato's actions also contributed to the causation of the accident. After careful consideration of the evidence and testimony presented, the Court finds Defendant 80% liable and Claimant 20% liable for the happening of this accident.
In light of the above determination, any motions made at trial upon which the Court had previously reserved, or which remain undecided are denied.
The Clerk of the Court is directed to enter interlocutory judgment in accordance herewith and a damages trial will be scheduled by the Court as soon as practicable.
Dated: August 5, 2024
Hauppauge, New York
_____________________
LINDA K. MEJIAS-GLOVER,
Judge of the Court of Claims

Footnotes

Footnote 1:The current name of the restaurant is Somni Tapas Bar and Grill.

Footnote 2:"T1." shall refer to Trial Transcript Page of May 22, 2023, trial date.

Footnote 3:"T2." shall refer to Trial Transcript Page of May 23, 2023, trial date.

Footnote 4:"T3." shall refer to Trial Transcript Page of May 26, 2023, trial date.